**FREEMAN MATHIS & GARY**
Sharon C. Collier / SBN 203450
Sharon.Collier@fmglaw.com
Nathaniel L. Dunn / SBN 255661
Nate.Dunn@fmglaw.com
1850 Mt. Diablo Blvd., Suite 510
Walnut Creek, CA 94596
D: (925) 210-2283
F: (833) 330-3669

Attorneys for Defendant
COSTCO WHOLESALE CORPORATION

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MILDRED LOO, an individual and FRED LOO, an individual,<br><br>Plaintiffs,<br>v.<br><br>COSTCO WHOLESALE CORPORATION and DOES ONE through ONE HUNDRED,<br><br>Defendants. | Case No. 3:24-cv-02454-RFL<br><br>**DECLARATION OF NATHANIEL L. DUNN IN SUPPORT OF DEFENDANT'S MOTION IN LIMINE NO. 1 – TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT, ANDREW KANEVSKY**<br><br>*Pre-Trial Conference:*<br>**Date: January 14, 2025**<br>**Time: 2:30 p.m.**<br>**Courtroom 15, 18th Floor**<br>**Hon. Rita F. Lin**<br><br>*Trial Date: February 3, 2025* |

I, NATHANIEL L. DUNN, hereby declare and state as follows:

1. I am an attorney with Freeman Mathis & Gary, counsel of records for Defendant COSTCO WHOLESALE CORPORATION ("Costco"). I make this declaration in support of the forgoing motion *in limine*. I have personal knowledge of the matters set forth herein, and if called as a witness, I would testify in accordance with this declaration.

2. This is a personal injury action in which Plaintiffs allege MILDRED LOO ("Mrs. Loo") had an unfortunate fall on January 17, 2024, while shopping at a Costco warehouse.

3. Plaintiffs contend Mrs. Loo was knocked to the ground by a Costco employee after checking out with her items.

4. Costco disputes liability for Mrs. Loo's accident.

5. Plaintiffs disclosed Andrew Kanevsky as their retained Retail Operations and Safety expert. A true and correct copy of Mr. Kanevsky's curriculum vitae is attached hereto as **Exhibit A**. A true and correct copy of Mr. Kanevsky's report is attached hereto as **Exhibit B**.

6. Mr. Kanevsky was deposed on December 10, 2024. A true and correct copy of the relevant portions of Mr. Kanevsky's deposition transcript is attached hereto as **Exhibit C**.

Executed under penalty of perjury under the laws of the United States of America on December 23, 2024, in Richmond, California.

NATHANIEL L. DUNN

# EXHIBIT A

# ANDREW KANEVSKY

Belleville, NJ | 718-813-5271 | andrewkanevsky@gmail.com | LinkedIn

## PROFESSIONAL SUMMARY

Experienced retail executive with over 27 years in corporate retail management, overseeing large-scale store operations, safety audits, and policy development. I have a deep understanding of operational best practices, having held senior leadership roles at multiple major retailers across the country. I possess extensive experience managing hundreds of employees, dozens of store managers, and ensuring the implementation of safety protocols to protect customers and staff. My career progression, from a part-time associate to a regional director and store operations executive, has provided me with a comprehensive view of retail operations, safety, and compliance.

In addition to my corporate experience, I currently own and operate a successful small business in Montclair, NJ, offering a unique perspective on both corporate and independent retail operations. My broad expertise in store operations, risk management, and safety protocols makes me a qualified expert witness in retail safety and operations.

## AREAS OF EXPERTISE

- Store Operations Management
- Retail Safety and Compliance Audits
- Policy Development for Consumer and Staff Safety
- Team Leadership & Training
- Multi-store Management
- Risk Management
- Talent Acquisition & Succession Planning
- Vendor Relations & Contract Oversight
- Incident Reporting & Investigations
- Small Business Ownership and Operations

## PROFESSIONAL EXPERIENCE

**Regional Director, Store Operations**
Jimmy Jazz | New York, NY
*2014 – 2022*

- Oversaw operations for 30 stores generating over $150M in annual sales.
- Responsible for all aspects of store safety, including auditing stores to ensure compliance with safety regulations.

- Implemented company-wide safety protocols and developed policies to protect both employees and customers.
- Led the supervision of over 700 employees and 40 store managers & co-managers, ensuring alignment with company safety and operational standards.
- Traveled extensively to oversee and audit store operations across multiple locations, identifying potential safety risks and ensuring compliance.
- Achieved significant reductions in shrink and improved operational efficiency by implementing strategic payroll control measures.

**Flagship General Manager**
Modell's Sporting Goods | Times Square | New York, NY
*2013*

- Managed the flagship store, driving sales over $34M annually.
- Led a team of 8 store managers and over 100 employees, ensuring compliance with safety standards and operational excellence.
- Conducted audits and inspections, ensuring that safety protocols were consistently followed across all operational areas.

**District & Regional Operations Manager**
Finish Line, Inc. | Greater NYC Metro Area | New Jersey | New England
*2004 – 2013*

- Managed 47 stores with over $151M in revenue and 450+ employees.
- Responsible for implementing and auditing safety practices across the chain, including risk management and loss prevention initiatives.
- Developed and implemented peer training programs to standardize safety and operational practices across all stores.
- Built partnerships with educational institutions like the University of Connecticut to develop recruitment pipelines for store leadership roles.

**Multi-Store Trainer & District Manager in Training**
Foot Action USA | Maryland | Delaware | New Jersey | NYC
*1995 – 2004*

- Progressed from part-time associate to leadership roles, eventually overseeing multi-store operations.
- Developed a strong foundation in all aspects of store operations, including safety, customer service, and employee management.
- Conducted audits and trained store teams on operational excellence and safety protocols.

## EDUCATION

Brooklyn College (CUNY)

## CERTIFICATIONS

Wicklander-Zulawski Certification in Interview and Interrogation Techniques

## ADDITIONAL EXPERIENCE

• **Board Member**, UConn School of Business, actively collaborating with the University Career Center to provide students with insights into retail management and operations.
• **Small Business Owner**, Montclair, NJ (*2021 – Present*): Own and operate a successful retail store, further expanding my understanding of retail safety, customer relations, and operations from the perspective of an independent business owner.
• Attended numerous industry conferences and workshops on store safety, operations, and risk management, gaining insights into best practices shared by national retailers.

## FEE SCHEDULE

- **Consultation**: $350 per hour
- **Depositions**: $450 per hour with a 4-hour minimum
- **Trial**: $750 per hour plus travel & expenses

# EXHIBIT B

To: Valerie Rose, Esq. & Jeffrey Clause, Esq.
WALKUP, MELODIA, KELLY + SCHOENBERGER
650 California St, 26th Floor
San Francisco, CA 94108
Phone: (415) 981-7210

Subject: Expert Report on Retail Safety for Mildred Loo vs. Costco
Date: October 23, 2024
Re: Mildred Loo vs. Costco

**Introduction and Qualifications**

I have been retained as a retail safety expert and consultant in the matter of Mildred Loo vs. Costco. With over 27 years of experience in corporate retail, including roles where I oversaw store operations, safety auditing, and policy development, I bring extensive expertise in managing safety protocols for large retail environments. My professional experience includes conducting training on injury prevention, emergency response, and ensuring that both customers and employees are protected from potential hazards in busy retail environments. I currently own and operate a successful retail business, which further provides me with the perspective of ensuring safe operations from both a corporate and small business standpoint. I have not provided testimony as an expert in the last four years. My CV and fee schedule are attached as Exhibit A.

**Materials Reviewed**

Costco Production COSTCO 0001-0014
Defendant's Rule 26 Disclosures
Costco Resp to Pltfs Req, ROG 1
Costco Resp to Pltfs Req, RFA 1
Costco Resp to Pltfs Req, RPD 1
Depositions with Exhibits: Karen Loo, Mildred Loo, Evan Rose, Marvena Noel, Beto Torres, Jacob Crowell

**Case Overview and Observations**

**Incident Summary**
On **January 17, 2024**, Mildred Loo was involved in an accident at the Costco warehouse in **Redwood City, California**, when employee Marvena Noel collided with her, knocking her to the ground. Following a review of all provided documents, depositions, Costco's policy and procedural documentation, and surveillance footage, I have identified several critical lapses in safety procedures and protocols.

**Expert Observations and Analysis**

**1. Lack of Spatial Awareness Policies and Training**

**Absence of Written Policies on People Management in High-Traffic Areas**

Costco's safety protocols focus on physical safety measures, such as preventing slip and fall hazards, managing spills, and avoiding obstructions. However, there is a complete absence of written policies or training materials that address spatial awareness, crowd management, and the interactions between

staff and members (customers) in crowded environments. Based on the materials provided, there are no training guidelines for employees to develop spatial awareness in high-traffic areas like the checkout lines, aisles, or entrance and exit zones.

In my experience, appropriate safety policies for a retailer with high customer volumes include a "people" component to ensure customer and employee safety in high traffic environments. This includes both a policy and procedure outline, as well as a training module to coach the team on what to do when the store gets busy.

In a high-volume retail warehouse setting like Costco, staff members require guidance to navigate safely and respectfully around customers. Despite the presence of guidelines for preventing physical hazards related to merchandise, there is no training specific to managing safe interactions with people, or 'members,' which Costco's model depends upon. The lack of policies focused on human interactions leaves employees unprepared to move through crowded areas safely, particularly in spaces where members may be vulnerable to being bumped or jostled.

**Employee Responsibility for Spatial Awareness**

In her deposition, Ms. Loo recalled being at the cash register with limited space when she was struck by the employee moving through this area. In high-traffic retail environments, the responsibility for spatial awareness and safe movement falls on the employees, as they are the ones tasked with navigating crowded areas and ensuring that their actions do not put members at risk.

It is standard practice in retail safety to train staff to be mindful of customer space and to anticipate proximity risks in congested areas. Notably, both Ms. Noel and Mr. Torres acknowledge the importance of spatial awareness, but Costco provided no tools to direct them on implementation.

Marvena Noel's lack of training on people or spatial awareness in high traffic areas is evident in her actions. Ms. Noel moved abruptly backwards without turning her head and looking to see her surroundings, causing her to collide with Ms. Loo.

**Lack of Recognition for Diverse Customer Needs**

In retail environments, a comprehensive safety approach includes awareness of the diverse needs and characteristics of the customer base, such as varying ages, mobility levels, body types, and cultural norms. Costco's policies do not consider or educate employees on these critical dimensions of customer service and safety. A well-rounded policy should train employees to anticipate these factors in their interactions, fostering an inclusive and conscientious approach to safely navigating spaces crowded with people from various backgrounds and with diverse physical capabilities.

This gap in policy and training indicates a failure by Costco to proactively create an environment that prioritizes the safety and comfort of both staff and members. Without formal guidelines or training, employees are left to rely on subjective judgment, risking careless or hurried behavior, especially in busy areas like the front end.

**2. Improper Positioning and Role of Marvena Noel**

**Inconsistency in Staff Roles and Responsibilities**

According to the deposition of Marvena Noel, she held the position of a Member Services Clerk. Both the Person Most Qualified (PMQ) and Beto Torres testified that trained front-end managers were present at the time of the incident, capable of handling cash pickups and other front-end responsibilities. Despite this, Ms. Noel was performing tasks outside of her regular duties, including conducting a cash pickup in a high-traffic front-end area, which ultimately led to the collision.

The video footage further highlights that Ms. Noel appeared to be moving frantically before the incident, indicating a lack of effective training on how to handle pressure in busy, high-traffic situations. In my professional experience, employees in high-traffic environments must be trained to remain calm, steady, and focused on their roles to avoid hurried, careless behavior. Tasks like cash pickups should be handled by employees specifically trained and assigned to those roles, especially in a crowded area where proximity to members is a concern. Costco's failure to ensure that appropriately assigned and trained staff were carrying out these responsibilities contributed directly to this incident.

**3. Inadequate Response to Injured Individuals**

**Improper Handling of Injured Members**

The video evidence reveals that, after Ms. Loo fell, Marvena Noel (with other employees present) made repeated attempts to physically lift her from the ground. In her deposition, Ms. Loo testified that while lying on the ground, she communicated to staff that she couldn't move and was in "excrutionary" pain. Despite this, employees continued to try to lift her, disregarding her statement of pain and immobility. In retail safety practices, a fundamental guideline is to avoid moving or lifting an injured person unless trained medical personnel are present. The risks of aggravating injuries by moving an injured person are widely recognized, and failure to adhere to these practices could lead to further harm. Compassion and care should be extended, but this does not involve physical handling of the injured party, especially when they are in clear distress.

The PMQ's deposition confirmed that Costco's management knew this was not acceptable behavior; however, Costco could not provide any written policies or training documentation to guide employees on proper procedures for handling an injured person. Without formal training or documentation, employees lack clear, actionable guidance on how to respond safely and compassionately. Costco's failure to establish written protocols for responding to injured members in the store environment reflects a significant gap in training and poses a direct risk to customer safety.

**Failure to Secure the Area Post-Incident**

After Ms. Loo's fall, the immediate area remained open to foot traffic, with no attempt by Costco staff to redirect members to other registers or clear the vicinity around the injured person. Members continued to walk around and step over Ms. Loo as she lay on the ground. This failure to secure the area around an injured member, particularly when alternative registers were available, represents a disregard for member safety and a lack of preparedness among the staff for handling incidents in high-traffic spaces.

**4. Repeated Incidents Involving Members Knocked Over by Staff**

**Pattern of Similar Incidents**

A review of incident records from the Redwood City Costco warehouse revealed multiple cases where members were reportedly knocked over or bumped by employees. This pattern suggests a broader issue with staff spatial awareness and movement in crowded areas. The PMQ testified to other similar incidents, indicating an ongoing problem that could benefit from targeted training, documentation, and procedural guidelines addressing spatial awareness, member interactions, and situational attentiveness.

Despite these incidents, Costco has not implemented additional training or formal policies to rectify this recurring problem. Although the PMQ mentioned that Costco holds meetings to review hazards and incidents, there was no evidence of meetings or discussions focused on incidents involving members injured or knocked over by staff. The lack of corrective action or documented policy changes demonstrates a failure to address repeated risks to member safety, which could have potentially mitigated the incident involving Ms. Loo.

**Conclusions and Professional Opinion**

Based on my review of the provided documentation, depositions, and video evidence, it is my professional opinion that Costco breached the standard of care. Costco's deficiencies in training, written protocols, and situational policies, as well as Ms. Noel's conduct, were a substantial factor in causing injury to Mildred Loo. Specifically:

1. **Failure to Provide Adequate Training on Spatial Awareness and Safety in High-Traffic Areas**
Costco's training focuses primarily on physical hazards related to merchandise or spills and lacks guidance on employee behavior in crowded areas. This lack of spatial awareness training contributed to the unsafe environment in which Ms. Loo was injured.

2. **Improper Staffing and Role Assignment**
Marvena Noel, a Member Services Clerk, was improperly tasked with cash pickup duties in a high-traffic area, despite the presence of trained front-end managers on duty. Costco's failure to assign roles properly contributed to hurried and frantic behavior, leading to the collision with Ms. Loo.

3. **Failure to Implement Proper Injury Response Protocols**
Costco staff attempted to lift Ms. Loo multiple times after she fell, despite the risks of exacerbating her injuries. Costco's lack of written guidelines on handling injured members left employees without direction, leading to unsafe and inappropriate handling of the situation.

4. **Lack of Corrective Action Following Similar Incidents**
Despite a documented pattern of members being injured by staff, Costco has failed to address these risks with updated training, policies, or procedural improvements. This negligence shows a disregard for member safety and contributes to an unsafe shopping environment.

In summary, Costco's lack of training and documentation regarding spatial awareness, human interactions, and injury response, compounded by a pattern of similar incidents, demonstrates a failure to provide a safe environment for its members.

Sincerely,

Andrew L. Kanevsky



Retail Safety Expert and Consultant
Phone: 718-813-5271
Email: andrewkanevsky@gmail.com

# EXHIBIT C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MILDRED LOO, an individual and FREED LOO, an individual,

Plaintiffs,

vs.

COSTCO WHOLESALE CORPORATION and DOES ONE through ONE HUNDRED,

Defendants.

Case No. 3:24-cv-02454-RFL

REMOTE VIDEO DEPOSITION OF

ANDREW KANEVSKY

Tuesday, December 10, 2024

Stenographically Reported By:
Vesna Walter, CSR, RPR, CCRR
CSR No. 11989
Job No. 10154491

either say congratulations, but it seems like -- my condolences that he didn't stay with Yankees but, you know, at that price tag, you know, I'm sure they'll be signing plenty of free agents in the next couple years.

But anyway, you've been retained in this matter as an expert witness; is that correct?

A Yes.

Q Okay. And what areas will you be giving expert testimony in?

A Retail operation, retail safety.

Q And what -- can you briefly give me your background and qualifications to -- in retail operation and retail safety.

A Yeah. I spent 27 years of my career in retail from 1995 until 2022 when I left the corporate world to open my own business, which is also a retail store; so technically, I'm still in that retail field. I specialized in store operations, safety, doing audits and writing policy, traveling the country overseeing stores and, you know, working with store leaders, executives, and managers to ensure safe environment for customers and staff.

Q And you mentioned you have your own business now. What kind of business is that?

A Yeah. I own a small custom cake shop, a family -- little family business in Montclair, New Jersey. We do designer bespoke cakes. I'm not the baker or the designer, but I run the business and all the operations for the business.

**Q Okay. And so have you been doing that for the past two years?**

A We're going to be three years April 1st.

**Q Okay. Well, congratulations on that. I know it's maybe a bit different than what you had previously, but it's always an adventure opening up your own business.**

**Is this the first business that you've operated that you were the owner?**

A Yeah.

**Q Okay. Mr. Kanevsky, can you briefly summarize your educational background.**

A Yeah. I went to Brooklyn College a long time ago.

**Q And you said you went to Brooklyn College. What did you study there?**

A I studied business, English. You know, I was a young guy growing up in Brooklyn in New York, and I was working full time and going to school full time. My career took me in a different direction

than I had expected. I didn't expect to be a lifelong retailer, but I moved up through the ranks and grew with the companies I worked for, moved all over the East Coast and provided some unique opportunities for myself in leadership roles.

**Q And did you obtain a degree from Brooklyn College?**

A No.

**Q And how many years were you at Brooklyn College?**

A On and off, probably five or six years. It's a long time ago. I don't remember exactly.

**Q And beyond your education at Brooklyn College, do you have any certifications in the areas where you will be giving expert testimony?**

A My area of expertise is based on my experience in the field in retail over a long period of time, working for various companies, overseeing stores' various footprints all over the country.

**Q And I guess what I mean by that is sometimes people have a lot of letters after their name, and I don't always know what the letters mean. Like, if you look somebody up on LinkedIn, it'll say, you know, Joe Smith ABCD, slash, you know, DEF. And I'm just wondering if you have any of those sorts of**

certifications in your -- you mentioned your work experience. But beyond your work experience, do you have any certifications from any organizations in the areas of retail operations or retail safety?

A I don't have any letters after my name. I'm certified for interrogation and interviews from Wicklander-Zulawski and I served on the board of directors for the Yukon School of Business.

Q Okay. So you have a certificate in interrogations?

A Correct.

Q Okay. And does your certificate in interrogations relate to the opinions that you will give in this case?

A I wouldn't say so, no.

Q Okay. And you mentioned that you served on a board. What board of directors did you serve on?

A For the Yukon School of Business.

Q And how long were you on the board for the Yukon School of Business?

A Three years.

Q And when was that?

A I want to say 2011. '10, '11, '12; '11, '12 '13, something like that.

Q Okay. And do you have any specific training

**in the areas of retail operations or retail safety?**

A Yeah. I mean, my whole career is a training ground. Yeah. Absolutely.

**Q And what specific training have you received in the areas that you will be giving expert testimony?**

A Yeah, I went to numerous conferences, seminars. I wrote policy for different companies. I audited stores on a routine basis for safety and operations. It was literally my entire career.

**Q Okay. When you mentioned that you wrote policy, which -- if you can, which retailers did you write policy for?**

A For Finish Line and for Jimmy Jazz and Modell's.

**Q I'm sorry. Finish Line, Modell's, and Jimmy Jazz?**

A Jimmy Jazz, yeah.

**Q And the policies that you wrote, what sort of policies were those?**

A It was a lot. It was a lot from -- from customer service base to retail safety. You know, as I would travel stores and observe behaviors or we would -- or the company would go through, you know, different things, you know, there would be a need to

addend or write policy based on that.

**Q Okay. So just as an example, things like an employee handbook, would that be something --**

A Absolutely. Yeah.

**Q Okay.**

A When I arrived at Jimmy Jazz in 2014, there was no employee handbook, and I was a part of the group that wrote it.

**Q And what about -- so other than the employee handbook, do you have anything like a loss prevention manual or any other store policies that you've drafted or participated in drafting for --**

A In all -- yeah. I did that at all the companies that I mentioned. I did not provide any proprietary information from those companies as part of this.

**Q Sure. And Costco has the same approach in terms of not necessarily producing proprietary information at the drop of a hat.**

**Do you have any examples that you might be able to provide, whether today or through counsel, of any of the policies or the handbooks that you've drafted?**

A I'm not at liberty to share other companies' internal documents or materials as part of my

participation in this case.

**Q Okay. And as part of your work history, have you given trainings to employees of the various stores that you've worked at?**

A Yes.

**Q Okay. And what sort of trainings have you given in the areas of retail operations and retail safety?**

A Yeah. I mean, we've done numerous workshops. We've done seminars with store leaders and managers, with district managers where we went through an audit report, coached them on what to look for. And our focus was -- you know, each company is a little bit different, but one of my initiatives in my role, I always believed my focus was twofold; that it was your physical safety items -- ladders on the floor, trip hazards, spills. I'm referring to those as an example of physical safety issues. And then there's personnel safety issues, which includes your customers and your staff, and that's a component of it as well. So my participation in the safety training and stuff like that would always be those two brackets.

**Q Mr. Kanevsky, have you ever had your deposition taken before?**

**Q And so, for example, in a loss prevention role, would that be a situation where maybe something was stolen from a store and somebody from the store has to go into court to testify?**

A Correct. Yeah. The majority of the loss prevention-type work I did would be in credit card fraud cases where I was testifying on behalf of the company and explaining how we took the loss and how we came about to find out about it and catch the person who did it.

**Q And when you've testified in cases involving HR, would that be, let's say, an employee had been terminated and then sued the company or something like that and you testified as to either the decision to fire that person or their job performance, something like that?**

A I would say something like that.

**Q Fair enough. I'm trying to just, you know, ask general questions and move on, but I think that you answered it. We can move on from there.**

**Has any Court ever admitted you to testify as an expert witness?**

A I don't -- I don't remember.

**Q Okay. And what I mean by --**

A Certainly not in the last five years that

I've worked on cases.

**Q And what I mean by that is when experts are called at trial, typically what happens is the party who's offering that witness as an expert describes their qualifications and then asks the Court for permission for the witness to testify as an expert, and I'm just wondering if that has ever happened for you where a Court has allowed you to offer expert opinions at trial.**

A I believe I answered that question. It was quite some time ago, but I believe the answer is yes.

**Q Okay. And was that ever as an expert in retail operations or retail safety?**

A It would be -- it would have been in operations.

**Q Okay. And do you have a list of any of those cases where a Court has admitted you as an expert witness in retail operations?**

A I do not.

**Q Okay. Has a Court ever prevented you from testifying as an expert in any case that you've testified in?**

A No.

**Q Do you have a list of any prior cases in which you've given deposition or trial testimony?**

A No.
**Q Okay. Have you ever done consulting work, meaning a company that maybe wasn't your normal day-to-day employer asks you to come in and do something for them like write a policy like you described before?**
A Yes.
**Q Okay. And can you describe some of the consulting work that you've done.**
A Yeah. I've been doing it a lot more since I've opened my own business and I'm no longer in the corporate field, because, you know, when I was working for a company, consulting for another company would have been a bit of a conflict of interest. But I have done it, yeah, and I've written policy. I've provided workshops and seminars for employers, especially in the hiring space and in the operations space how to effectively lead your team, motivate your team but also, in auditing -- in the field auditing space where we've created audit reports to help retailers and other companies, especially small businesses, make sure that they're, you know, checking all the boxes for safety and operations.
**Q And maybe you're not able to tell me the names of the types of businesses that you've written**

**policies, but can you -- have you written any policies for any big-box retailers?**

A Yes.

**Q Okay. And the policies that you've written for big-box retailers, have any of them dealt with customer safety?**

A Yes.

**Q Okay. And how long ago did you -- was the last time you wrote a policy like that?**

A Within the last two years.

**Q Okay. And within the last two years, how many times have you drafted a policy for a retailer that involves customer safety?**

A It would be probably two or three times for various consulting clients that I've had, both big box and small business.

**Q Okay. And do you have a template for any of those policies that you start from?**

A No, because it's important to assess what the company already has first. So I don't want to go in with any preconceived notions. We go in with a complete open mind and just a lot of curiosity.

**Q We received a copy of your expert file from plaintiff's counsel. Do you have any emails between yourself and plaintiff's counsel that were not**

**beginning of February. Are you available in the beginning of February?**

A I'm going to work with Jeffrey and his team to do what I have to do to help participate in the trial.

**Q Okay. Of the businesses that you've worked with, do you have any specific experience working for retailers in California?**

A No. We -- the companies that I've worked for had stores in California and I've been to California to assess those stores. But if you're asking if it's a California-based company, I would say no. But national retailers have headquarters all over the country and locations all over the country, California being one of those.

I don't know if that answers the question.

**Q It's fine.**

**When is the last time that you've been to California to assess a store?**

A I don't remember.

**Q Has it been within the last ten years?**

A Yes.

**Q Has it been within the last five years?**

A Wait. Ten? Probably not ten. Probably a little longer ago than that.

**Q Okay. Is this the first time you've ever been retained as an expert to give an opinion as to the operations of a California location --**

A Yes.

**Q -- of a retailer?**

**Other than -- so is it fair to say that most of your experience is on the East Coast?**

A East Coast and Midwest.

**Q Okay. This is not the first time that you've been retained in a litigation setting; is that correct?**

A Correct.

**Q Okay. What percentage of your work is for plaintiffs versus defendants?**

A It's a tough question. I don't have an answer for that.

**Q Okay. How many times have you been retained as an expert in a case that is in litigation?**

A This is my third one this year. I did a lot of these a long time ago and then I stopped, and then I've done more recently. So I don't have a lot of answers for some of the older cases.

**Q Okay. You mentioned that this is the third case this year. In 2023, how many cases did you have where you were retained in a case that was in**

Q Okay. Have you ever worked for a warehouse store?
A No.
Q Okay. Have you ever consulted for a warehouse store?
A Define "warehouse store."
Q Yes. So a warehouse store like, let's say, a Costco or a Sam's Club, a location where most of the product is displayed on pallets in a wholesale-type setting. Have you ever worked in a retailer like that that's a warehouse-type store?
A No.
Q Okay. And it appears that -- and don't allow me to mischaracterize this, but it appears that of the locations that are listed on your CV for your work experience, most of these are either sporting goods or shoe stores; is that correct?
A Yes.
Q Okay. And have you ever worked in a store that sold groceries?
A No.
Q Okay. Have you ever worked at a location with more than ten cash registers?
A Yes.
Q Okay. And which of these locations has more

than ten cash registers?
A Yeah. Like I said before, I oversaw multiple stores in many of my roles, and we had stores that had more than ten registers. You know, going back years ago before I, you know, elevated into multi-store management, I was a store manager at the Finish Line in Garden State Plaza, and that had ten registers. So, you know, we have big stores that have a lot of registers and a lot of volume.
Q Okay. So when I see Jimmy Jazz, it says oversaw operations for 30 stores generating over 150 million in annual sales. And then for Finish Line, it says managed 47 stores with over 150 million in revenue and 450 employees. Do you know how that compares with Costco's annual sales?
A No. I have no way to know what Costco's annual volume is.
Q Okay. And I'll represent to you that according to figures I saw this morning, that Costco's annual sales are 175.39 billion, with a B. So that means that the stores that you were at were about one-one-thousandth, if I can speak, of the size of Costco in terms of nationwide volume. Does that sound about right?
A I mean, it's -- the thing is, is that in the

stores that I worked for, we didn't have ticket items that were 700 or $800, which is going to affect your total revenue. But I worked in stores that were extremely high volume and extremely high traffic as far as people walking through the door. So while I respect what you're saying, I think that I'm perfectly qualified to speak to, you know, any retail environment, you know, having worked in a place like Times Square, which has more foot traffic and more people than, you know, probably anyplace in the world.

**Q And the location in Times Square that you mentioned, how many -- if you can recall, how many customers walk through the door per hour when it's busy?**

A Yeah, I don't -- I don't remember. It was more than ten years ago, but -- I don't remember. But I can tell you it was extremely high traffic, extremely high volume. You're talking about a store that was open till 1:00 o'clock in the morning. So it was packed, you know, almost 24 hours a day.

**Q Do you have any experience working for a retailer with more than one billion dollars in annual sales?**

A Yes.

A In that range.

**Q Do you know how that 180 locations compares to the number of locations that Costco has?**

A I'm sure it's much smaller, yeah.

**Q And you mentioned some of the policies that you've written for -- either in a consulting role or for your employers. Have you ever written a policy before about spacial awareness?**

A It was something we talked about all the time in our safety audits and checklists when we talked about the personal aspect of it. Like I said, whenever we went in and talked about policy regarding customer and employee safety, it was the physical and the people. So we talked about spacial awareness every single time. It was something that we coached our employees on all the time, just always be aware of your surroundings, always be aware of the people around you and just keep your head on a swivel.

**Q And I appreciate that that was something that you talked about.**

**Did you ever have a written policy regarding spacial awareness?**

A Yeah. It was part of our -- it was part of our training.

**Q And when you say it was part of your**

**training, was there any written materials related to spacial awareness that were either given to employees or something that they could refer to?**

A Yes.

**Q Okay. And what are the key elements of a written policy for spacial awareness?**

A It just focuses on being aware of your surroundings, be aware of keeping -- you know, we joked during COVID when they rolled out the six-foot rule because we always had -- we always had that rule to give space to your staff, give space to your customers, especially in high-traffic situations and high-traffic stores where lines would build up or things of that nature. We always wanted to create spaces, and we had people that were accountable for doing that.

**Q So other than being aware of your surroundings, what other elements are there to a written policy for spacial awareness?**

A I don't have the documents in front of me; so it's hard to answer that question exactly. But it's an extremely important component of safety training.

**Q And so in terms of a retailer having a written policy for spacial awareness, that written**

**policy should indicate to employees that they should be aware of their surroundings; correct?**

A And make sure that there's enough room to move safely.

**Q And so being aware of your surroundings, having enough room to move safely. Is there anything else that should be included in a written policy for spacial awareness?**

A Is there anything that should be included in that? I mean, that's -- I mean, that's pretty much what it is. I mean, spacial awareness is the awareness of your surroundings. So I mean, it doesn't -- to have -- you're not going to have, you know, five or six line items on something like that. It's going to be a bullet point, one of many other things to look out for when you're doing a safety audit, is your team aware of the space around them, are they aware of the customers around them, are they giving enough space to people.

**Q Okay. So from your perspective, the two things that a written policy needs to say in regards to spacial awareness is, one, for the employees to be aware of their surroundings, and number two, to have enough room to move around safely. Is that it?**

A I'm sorry. Can you repeat that.

Q Yes.

One of your opinions in this case relates to whether or not Costco had a written policy regarding spacial awareness. And I'm just trying to, you know, figure out how this all could have gone better. And, you know, every case is a -- I usually tell people every case is a learning experience that we can, you know, improve and move forward.

So from your perspective, the written policy needs to include, number one, an indication to employees that they need to be aware of their surroundings, and number two, that employees need to have enough room to move safely. Did I catch the elements of a written policy for spacial awareness?

A Yeah. I mean, I think those are two important bullets that you'd want to capture.

And then I think it's about a constant -- you know, the one thing in any training program is, is consistency and repetition. And having that in writing where it can both be seen and spoken to is important, you know, for coaching -- for coaching the team.

Yeah. I think that would be -- you know, and I would have to look back at some of the other materials that I've written to see if there were any

other focuses, but just generally being aware.

And I'll add that in the 27 years that I operated retail locations and oversaw multiple stores, you know, we never had a situation where an employee collided with a customer to the nature that -- of what I saw in the video here.

**Q And I'm just -- this is, you know -- other than your written report, this is my only opportunity to get your opinions before we go to trial. And so I'm just trying to figure out what Costco needed to have in terms of a written policy regarding spacial awareness. And other than the two items that we just talked about, are there any other elements of a written policy regarding spacial awareness that Costco should have had?**

A I would say that if I were advising Costco, if that's the question you're asking me -- if I were advising Costco, I would say that there should be something that coaches -- something in writing that would coach employees on moving safely, you know, in a very -- you know, Costco is a very diverse environment from a customer standpoint. You have people of all backgrounds and walks of life, and not everybody is going to move the same way. So having an awareness for those different types of people and

making sure that your employees are aware of that as well, I think is extremely important, especially in a place where you have shopping carts and you have these big flatbed push things that are heavy. You know, all of these things can cause injury. And if people aren't -- forklifts is another thing. And, you know, just -- if we're not aware of our surroundings, we're not aware of the people around us, you know, we open ourselves up to these types of injuries.

**Q And you mentioned, you know, if you were advising Costco, and then you described some of the things that you would advise. Are you aware of whether or not there's any industry standards for having a written spacial awareness policy?**

A I would say that it's common practice to coach your team -- especially in high-volume, high-traffic situations, to coach your team on spacial awareness and being aware of the people around you and how much space you're giving to other people. I would say that that would be a common practice, yeah. I would term that as common.

**Q And is that a common practice in the New York/New Jersey area or is that nationwide?**

A I mean, retail is retail. So I don't see

why we would talk about that in New York and New Jersey and not talk about it in California. You know, to me, it's -- you know, retail is retail. And when you have a lot of people in a space, you know, you have to watch out for one another and keep everyone safe.

And by the way, that's part of being a high-level customer service operation, is creating a safe environment for your staff and for your employees -- and for your customers. I'm sorry.

**Q Okay. Of the -- other than the retailers listed on your CV, are you able to give me the names of any other retailers that you're aware of who have a spacial awareness policy?**

A I am not able to discuss policy and procedure that's proprietary to other retailers that I have worked with.

**Q Okay. And other than the retailers that that are listed on your CV, are you aware of any retailers who have written spacial awareness policies?**

A Yes.

**Q Okay. And who are those -- who are those retailers?**

A Again, I'm not able to -- you know, if I've

been brought in to consult with a retailer, that's done, you know, confidentially as a private agreement, and I'm not comfortable bringing those retailers into this case. They didn't ask for that.

**Q Okay. And are you aware of who the top ten retailers are in the United States?**

A Am I aware of who the top ten retailers are? In terms of volume or in terms of their rating?

**Q Well, let me just -- let me just read some names.**

**So Walmart, Costco, Kroger, Home Depot, CVS, Target, Walgreens, Lowe's, Albertson, Publix; are you aware of those companies?**

A Yes.

**Q Okay.**

A Some of them.

**Q Have you worked with any of those companies?**

A No.

**Q And so is it accurate that you do not know if any of those companies that I just named have a written policy for spacial awareness?**

A It is accurate that I don't know if those companies -- those particular companies, correct.

**Q So is it accurate that you cannot give an opinion to a reasonable degree of certainty in your**

**field that the largest retailers in the United States all have written employee spacial awareness policies?**

MR. CLAUSE: Objection. Assumes facts.

Go ahead.

THE WITNESS: I cannot speak to what policies retailers that I have not worked with or have not partnered with -- what their policies -- I cannot speak to what their policies are. I can say that I have a lot of industry contacts that I'm friends with, that I've worked with in other capacities, and some of those people who I know very well for a long period of time work for many of the companies that you said. And some of those companies -- some of those people that work for those companies would -- they would -- I'm trying to think of how I want to say this. I think that the idea of being aware of your surroundings and ensuring that you give enough space to those around you is something that several of those retailers would implore their staff to do, based on people I know in the industry that have worked there.

That said, to answer your question directly, I have not seen their policies. But having spent the time in retail that I have and worked in the industry as I have, I know many people that work for many

retailers, and a spacial awareness concept is not a foreign one.

BY MR. DUNN:

**Q Okay. And -- all right. Mr. Kanevsky, when were you first contacted about this matter?**

A In October.

**Q I'm going to drop Exhibit 2 into the chat and I will share my screen.**

**And so, Mr. Kanevsky, I've put up on my screen Exhibit 2. Do you recognize this document?**

A Yes.

(Exhibit 2 was marked for identification.)

BY MR. DUNN:

**Q Okay. And so you mentioned that you were retained in October. Does this document relate to your retention in this case?**

A Yes.

**Q Okay. And when you were first contacted, what was the scope of work that you were given in terms of the opinions you were asked to give?**

A Jeffrey and I spoke. I was given a very brief overview of the case. Once I was retained, I was sent the documents and files pertaining to the case for my review.

**Q And did you take any notes related to your**

requests for admission 1, Costco's response to plaintiff's request for production of documents number 1, and then depositions with exhibits for Karen Loo, Mildred Loo, Evan Rose, Marvena Noel, Beto Torres, and Jacob Crowell.

My question, Mr. Kanevsky, are those the materials that you reviewed in this case?

A Yes.

Q Okay. And one of those documents in Costco's production was the video of the accident. Did you see the video of the accident?

A I did.

Q Okay. And the video of the accident is, I think -- I think we included the hour before and the hour after. So it might be -- and I can just pull this up. I'm not going to share it on my screen. I'm just trying to get a sense of the length of the video.

A It's about a two-hour video.

Q Okay. Now, that two-hour video, did you watch it from start to finish or did you skip ahead to the accident and watch the accident?

A Both.

Q Okay.

A I watched -- I went to the part with the

accident first and watched it several times and then watched the video before and after to get a feel for the operation just from what I could see through that lens.

**Q And so if I understand your testimony, you did identify the portion of the video where the accident happened and you watched that, and then you also watched the entire video from start to finish?**

A Yes.

**Q Okay. The entire video from start to finish, how many times did you sit down and watch the entire video from start to finish?**

A Once.

**Q Okay. And did you watch that on normal speed or 2X speed? Did you speed it up at all?**

A I don't believe I did.

**Q Okay. And so other than the accident involving Mrs. Loo, do you have any other observations or comments on the operations of the warehouse that day that you are critical of?**

A My focus in this -- in this report, Exhibit 3, is on the accident with Ms. Loo.

**Q And so in terms of -- and I appreciate that. But ultimately, this accident did not happen in a vacuum. It happened at this warehouse.**

**And so I know that -- we're going to get to the accident in itself, but other than the accident, did you see anything else in the video that you deemed was unsafe?**

A I would say that -- and I'm only observing the front-end area because that's the only video that I was provided. So I don't have the video of the entire warehouse. But I would -- I guess the word I would use would be a little frantic; that there was -- I didn't identify one person that seemed to be in control of the front end. If you're asking for an observation, that would be the one that I would give.

**Q And so when you watched the video, you were not able to identify somebody who was in control of the front end. Did I get that right?**

A Right. When you have a very busy front end in a high-volume, high-traffic retailer, you typically want to have a point person, a quarterback, if you will, just to use an example. And that person is directing traffic, overseeing the entire thing. And I did not observe one person in the video that I could point to and say, this person was the quarterback.

**Q Okay. And what are some of the things that you would look for in identifying who -- to use your**

**terminology, the quarterback, which I appreciate as a football fan myself -- what are some of the things that you look for in identifying somebody who's directing traffic?**

A Yeah, just an obvious leader. Just you want to have one person that has -- I would use the word presence; right? Who had presence that you know, like, okay, that's the person who's in charge of the front end. That's the one. I didn't -- I didn't see any one person that I felt had presence of control. And to illustrate that, I learned in the deposition of Marvena Noel -- and I hope I'm saying her name right.

**Q We all get it wrong. So don't worry.**

A Okay. But in her deposition, I learned that she was a membership clerk. But in the video -- not just in the accident portion of the video -- she's all over that front end running back and forth -- maybe not running but briskly walking back and forth. And I appreciated the hustle, but if she's a membership clerk, I would have expected her to be in the membership area. And I didn't observe one person who was demonstrating the presence of control over the front end, if that makes sense.

**Q I understand what you're saying.**

**When you describe what you watched during that two-hour video as frantic, what do you mean by frantic?**

A Yeah, just -- like, just a little chaotic. Like -- like, nobody was in their -- you know, the cashiers were ringing up and there were people back and forth, but there was nobody that was just calling the shots: Hey, you're going here, you're going there, this is what it is, just moving the customers along in an organized fashion. It was just a bit of a free-for-all, which can happen in a busy environment. But if it's well run -- if it's truly well run, there will be somebody in control making sure that even though it's busy, even though it's high traffic, and even though it's fast, it's not chaotic.

**Q Okay. And so when you use those terms like "frantic" and "chaotic," you're referring to the Costco employees?**

A I'm being descriptive of the overall environment based on the video alone. And if I'm being fair and honest, the video alone doesn't tell the whole story of an operation. It's multifaceted. I'm looking at it from one camera and one lens and you're asking for my observation through that lens,

and that's what I'm telling you.

**Q And I appreciate that.**

**And then the other part of this is that because we have a video with no audio, you're not able to perceive the communications that are happening among the employees that are depicted in the video such as radio communications --**

A Correct.

**Q -- overall communications, things like --**

A But I can see it. I can see when they radio and I can see hand gestures, which tell a story as well. And I didn't see a lot -- you know, I didn't see a lot of -- again, I didn't see one person in control, you know, with the body language and the hand gesturing that would show me that presence that I was looking for.

**Q Other than the -- and let me just put your report back up on my screen.**

MR. DUNN: And before I do that, are folks okay or should we take a break? We've been going about an hour. I'm probably about halfway through.

MR. CLAUSE: This is Jeff. If you're halfway through, we can take a break. If you want to go a few more minutes and go till a stopping point, that's fine.

those transcripts. So I thought I had a pretty good understanding. It was a short call.

**Q Okay. And the only materials that you had access to is what you were given by the plaintiff's counsel; correct?**

A Correct.

**Q Okay. So you don't have access to Costco's intranet; correct?**

A Correct.

**Q Okay. And you did not receive Costco's entire loss prevention manual; correct?**

A My report was based on the items that I received, and I think it says that in the report; that it said that I did not -- you know, if it says, like, I didn't see a policy on XYZ, that's because I didn't see it.

**Q And my question --**

A That doesn't mean it doesn't exist. It just means this is what I was given and this -- my observations are based on that.

**Q And my question is you don't have a copy of Costco's entire loss prevention manual; is that correct?**

A Correct.

**Q And you do not have an entire copy of**

**Costco's employee handbook; correct?**

A Correct.

**Q Okay. And you don't have access to what's called Costco U, their database of training materials and policies?**

A Correct.

**Q Okay. And so is it possible that there are materials that you have not yet seen regarding Costco's policies and in training of its employees?**

A I'm sure there are materials that I haven't seen. Again, my report and my opinion is based on only the materials that was provided to me.

**Q Okay. And did you consult with any articles -- or did you look at any articles regarding industry standards or anything like that?**

A No. I based it on my experience. I based it on the knowledge that I have over the years, the seminars and workshops that I've done with other retailers and my work and experience.

**Q Do you have a list of any of the conferences or seminars that you've given?**

A I would say participated in, not given. And I don't have a list, no. You know, at the time that I was doing that as an employee of a corporate entity, I wasn't taking record of that stuff because

of a case that I might work on 15 years later.

**Q Okay. And do you have a list of any conferences or seminars that you've presented at?**

A Again, you know, I wasn't -- you know, when I was in those corporate fields, I wasn't taking notes, saying, hey, I'm presenting at this or presenting at that. I was not doing that, no.

**Q Okay. Have you ever written any articles?**

A Have I written articles? Yes. Have they been relevant to this or to retail? No.

**Q What sort of article -- okay. So you have not written any articles that are relevant to this case?**

A Correct.

**Q Okay. What sort of articles have you written?**

A Fashion stuff for -- in the sneaker space years ago for "Complex" and for some other publications. But that had -- that has nothing to do with retail or with this.

**Q How about pizza reviews?**

A I am not a -- I do not give public pizza reviews.

**Q Okay. Fair enough.**

A Although I will say that I am a pizza snob.

**Q Fair enough.**
**And are there any set industry standards or guidelines that you are aware of that are the best practices for retailers?**
A That question is a little vague. I don't really understand what you're saying.
**Q Sure.**
**So you've -- obviously, you have -- as stated in your report, you have certain opinions regarding what Costco should or should not have done as it relates to Ms. Loo's incident and Costco's policies and training in general. Are there any industrywide standards or guidelines that you are aware of that constitute the best practices for retailers?**
A The term "industry standard" is -- you know, I prefer common practices. And there are many common practices among retailers. There are many that are common practices. I don't know which one or which ones you'd like me to speak to right now, but I think there are many common practices that retailers nationwide all employ.
**Q And of those common practices, are they written down anywhere where I would be able to look them up?**

A I don't think there's a bible of retail practices. I think that, you know, there are -- those common practices are things that are taught industrywide. And many retailers employ the same practices, because the thing is, in retail, what you sell is really irrelevant. The skills are transferrable. So whether you're a grocery retailer or a clothing retailer or a sporting goods retailer, the overall skills are the same. It's the merchandise that's different. But the skills are transferrable. They're the same.

So because of that, many retailers have common practices that are similar across the board. And as you go from retailer to retailer and as you speak to people in the industry, you find that to be the case.

**Q And are those common practices that you're describing written down anywhere or it's just something you've got to be there, you've got to live it in order to get --**

A Each retailer has their own handbook, has their own loss prevention guide, has their own safety guidelines, has their own university, right, internal training documents and programs. And many of the -- much of the content is similar from retailer to

retailer to retailer. But there is no one -- there's no, like, entity -- there's no governing body over all retailers that would have a written list.

**Q And will you be giving any opinions at the time of trial as to whether Costco's loss prevention manual or employee handbook falls short of including things that are common practices in other retail situations?**

A I'll give the opinions that I give based on the material that I have. So if I'm provided with a Costco loss prevention policy book and a Costco employee handbook and I'm able to review those, then I can speak to how they crack up to other retailers that I've worked with or worked alongside. But I can only speak to the material that I was provided and how it relates to my observations in this case.

**Q So you will be -- you may be critical of the materials that you have been provided, but you cannot speak to whether Costco's entire intranet or entire loss prevention manual or entire employee handbook or Costco U is deficient from the common practices in the industry; is that correct?**

A I can only speak to materials that I have been provided that I have reviewed --

**Q Okay.**

A -- in comparison to what I know to be true throughout the industry.

**Q Fair enough.**

**And you have some criticisms of Costco in this case; is that correct?**

A I have observations in this case that led me to believe that the behaviors of the employees led to the collision that injured Mildred Loo.

**Q And let's just start with Costco. Do you have any criticisms of Costco or observations as it relates to Costco? And we'll get to the employees separately. Do you have any observations or criticisms as it relates to Costco in this case?**

A I believe, in my report, I thought Costco was deficient in providing guidance for the employees to have an understanding of the spacial awareness that we discussed earlier, being aware of their surroundings. And I thought that there was no -- or I did not see, based on the materials I was provided, anything that spoke to -- in their documents anything that spoke to the human aspect of a retail business.

**Q And so you found that Costco fell below the common practice that you observed in your prior work experience; is that correct?**

A In that regard.

**Q Okay. And do you have any other criticisms of Costco in this case?**

A I would have to refer to my report. My report -- I stand by what's written in my report, whatever those observations were. I can refer to it if you'd like.

**Q Okay. And -- yeah. We can put the report up. So I'll share my screen again.**

A Yeah. So I thought Costco fell below the standard, just as I said before, as far as written policies on people management in high-traffic areas; that there was no mention in any of their policy documents that I reviewed -- and I want to just make sure that I say that I reviewed -- that spoke to managing a crowded area, customer flow, traffic flow, or even what to do if there was an injured customer or employee.

There was no mention of a diverse customer base. There was no mention of what to do if somebody did get hurt, again, based on the materials that I reviewed. If this existed in an internal document that I was not privy to, I have no knowledge of that.

**Q And is your report a thorough and complete summary of your opinions that you will give at trial in this case?**

report. And I can either put it on the screen or you can just refer to it, because I think you have a copy in front of you.

A I do. Are we talking about the Opinion 1, the absence of written policies on people management in high-traffic areas?

Q Yes. So on page 1 of your report, there's a heading that says "Expert observations and analysis." And so I'm starting with Number 1, lack of spacial awareness policies and training. And then the first part of that says "Absence of written policies on people management in high-traffic areas." And I think you described that earlier. You're really referring to, of the materials that you were provided, you didn't see a -- written policies on people management in high-traffic areas; is that correct?

A Yes.

Q Okay. And, again, you don't have any information as to what other retailers in this particular segment of the retail space, you know, especially at the top such as Walmart, Costco, Kroger, Home Depot, CVS, Target, Publix -- you don't have any information as to what those -- other than Costco, you don't have any information as to what

**their -- the other retailers in this space -- what their spacial awareness policies and training are; is that correct?**

MR. CLAUSE: Objection. Assumes facts.

Go ahead.

THE WITNESS: Yeah. As I stated earlier, I mean, I don't have -- I don't have exposure to internal documents for companies that I have not worked with or alongside or for -- that I haven't worked for. I don't have exposure to those internal documents.

But like I said, over the 27-plus years that I've been in retail, I have a lot of friends, a lot of contacts in the industry, and it is my understanding that some of the top retailers do speak to these things. But I do not have their internal documents to share in this case.

BY MR. DUNN:

**Q Okay. And then other than written policies, would you agree that a lot of training that happens at retailers happens through direct face-to-face conversations and -- you know, I might use the term coaching, but supervisor-to-employee, manager-to-employee, direct face-to-face coaching?**

A Yeah. I mean, coaching is huge. But

there's also, you know -- I think you said Costco has the Costco U. Many retailers have an online, you know, university, you know, type situation. And in the best training environments, you're using those internal tools along with that personal interface of one-on-one coaching. And so, you know, the employee is reading and learning through the online platform in the university, and then the manager or team leader or whoever is in charge of training and coaching is then reinforcing that with applied practice.

And, also, it's important for leaders and managers to observe employees' behaviors, and if you see something that falls outside of the standard of excellence, you pull that employee to the side and you take advantage of that coachable moment to show them how to improve. So it's a combination of a hard training program and also your managers and your field team coaching.

**Q And do you believe you have sufficient information to opine as to the sufficiency of Costco's in-person coaching and training at the warehouse where Mrs. Loo had her accident?**

A Well, one of the depositions -- and I'm going to refer to the report here. I think it was

the PMQ talked about their group training sessions. And so, you know, based on the depositions of the Costco employees that I reviewed, including that one with the PMQ where he spoke of -- and I think it was Jacob Crowell spoke of the break-out sessions that they had. And I'm not sure if that's the term he used, but that's what he described. Based on those break-out sessions, this Costco had other collision situations in the store, but there were no training break-outs to coach the team on those.

So I do think that I am able to provide color to an in-person training environment based on the depositions given of those situations by the employees themselves.

**Q And how do you know that there was no coaching or conversations regarding any of the prior accidents at this store?**

A It was in the deposition.

**Q Okay. And --**

A I read it in the deposition. I believe I did.

**Q Okay. And how many prior accidents are you using as a point of reference for there being prior accidents at this store?**

A I thought I saw a document that referred to

three, including Ms. Loo's.

**Q Is three accidents in over a five-year time frame -- is that a lot, in your opinion?**

MR. CLAUSE: Objection. Assumes facts.

Go ahead.

THE WITNESS: If you're asking me if I think that three instances of employee staff collisions that resulted in a documented incident report is a lot -- is that the question, Mr. Dunn?

BY MR. DUNN:

**Q Yes.**

A Yeah. I would say, in 27 years of my experience, I've had zero incidents in my stores of collisions with employees resulting in incident reports and injury. So I would say three in five years is a lot, yes.

**Q Have you ever had a personal injury claim filed against one of the stores that you worked in?**

A Not to my knowledge.

**Q Okay. So it's your testimony that the warehouses -- or I'm sorry -- the stores that you worked in -- Jimmy Jazz, Modell's Sporting Goods, Finish Line, Inc., Foot Action USA -- none of those stores have ever had a personal injury claim filed against them?**

incident reports filed, but we have not had collisions with customers and staff that resulted in injury or incident reports.

**Q And approximately how many trip-and-falls are you aware of?**

A I have no idea.

**Q Okay.**

A It was very infrequent. I will say that.

**Q Do you know how many people or shoppers come onto the Redwood City warehouse premises every day?**

A That wasn't provided in the documents that I was given.

**Q Do you know how many times -- how many customers in total Costco has had come into its warehouse over the past five years?**

A Again, I was only given the documentation that I was given.

**Q And so without knowing how many shoppers have come into the warehouse over the last five years, can you be confident that three accidents in between an employee and a member is still a lot as opposed to relatively good?**

A You're asking for my opinion, and I think it's a lot.

**Q Okay.**

A I'll also add, Mr. Dunn, that those are the documented ones. We don't know how many were undocumented where somebody was knocked over and got up and said, "I'm fine," and kept it moving. We're only speaking to documented ones.

**Q Okay. Would you agree that it's impossible to eliminate all accidents even when a store has policies in place?**

A Yes.

**Q So, for example, people trip over things.**

A Correct.

**Q Sometimes people wear inappropriate footwear and they just fall because their heels are too high.**

A Sure.

**Q Okay. And sometimes customers bump into each other.**

A Oh, yeah.

**Q Okay. That's part of going out in public, isn't it? You can't eliminate all human contact.**

A Correct.

**Q Okay. And in terms of policies regarding managing customers in high-traffic areas, how is a warehouse retailer supposed to manage people in high-traffic areas?**

MR. CLAUSE: Overbroad.

BY MR. DUNN:
**Q You can answer.**
A Repeat the question, please.
**Q Yeah.**
**What should warehouse retailers such as Costco do to manage customers in a high-traffic area?**
MR. CLAUSE: Same objection.
Go ahead.
THE WITNESS: Well, I think -- I think this is -- this comes back to the conversation we had before the break where you have a quarterback and a leader who has presence in those high-traffic areas to direct traffic, to make sure that the staff and the team is in the right spot, doing the right things. That's what coaching is all about. That's what leadership is all about.
BY MR. DUNN:
**Q Okay. And how do you define a crowd in a setting such as this in a warehouse retailer?**
A You define a crowd any way anyone else would define a crowd. It's an accumulation of people in a relatively small area, I would guess.
**Q Would you agree that Mrs. Loo did not fall down due to there being a crowd of people?**
A I would agree that Mrs. Loo did not fall

shopping in the store.
BY MR. DUNN:
**Q Are you critical of Mrs. Loo for not using an electric scooter while shopping on the date of the accident?**
A No.
MR. CLAUSE: Objection. Beyond the scope.
You answered. Go ahead.
BY MR. DUNN:
**Q You can go ahead.**
A I said no.
**Q Okay. And in terms of Costco's written policies, what -- other than what you've already testified to, are there any written policies that Costco should have had that you don't believe that they had?**
A Yeah. I think a big one was what to do -- I didn't see -- again, speaking specifically to the documents that I was provided, I did not see anything to guide the team on what to do in case of an injury, and I thought that that was an enormous -- an enormous miss on the part of the retailer.
**Q And other than how to deal with an injury, is there anything else that Costco should have had a written policy on, in your opinion?**

A Yeah. Again, we talked about the spacial awareness piece. So, you know, I don't want to be repetitive there. We discussed that.

And I'm unsure, again, not having their entire training program, what kind of training was provided for the front end on having presence and being aware and making sure that the traffic flow was conducted in an orderly fashion.

**Q Okay. Have you ever written a policy on how to deal with a customer who's injured?**

A I've participated in policy writing, yeah. I wasn't the sole person. In many cases, when policy is written, it's done so in a group setting or a committee where everybody has input. You talk it out and, you know, there's people from different departments involved, and then, you know, once everyone comes to agreement, a policy is written.

**Q What are the key points that should be included in a written policy regarding dealing with members who are injured?**

A The most important thing is to make sure that we -- we -- and when I say we, I'm saying as a retailer; right? We, the retailer, don't do anything that could potentially exacerbate the injury. So if a customer is knocked down or if a customer falls, if

a customer hits their head, whatever the injury might be, if they request medical assistance, then, you know, we don't want -- we want to wait for the professional -- the medical professionals to arrive.

And I guess I'll speak to this as part of the answer to this question. And I don't want to answer it too long. But when I observed the video, I was aware of only the basics of the case. So I was reviewing the video of a customer that was knocked over in Costco. That's literally the only, you know, details of the case that I had when I started reviewing. I had no -- there was no, like, in-depth description given.

So when I began watching the video, I expected to see a collision resulting in a fall, and I saw that. So I wasn't surprised by that. But what I was shocked to see and really appalled, honestly, was when the employee, who I now know to be Marvena Noel, attempted to hoist Mildred Loo off the ground not once, not twice, but I believe three times. And because we don't know what -- I'm certainly not a doctor, and I can't speak to what her injuries are or were or where and when they occurred. But at the point that she hits the ground the way she did, it's very easy to see that you could further her injury by

attempting to lift her off the ground.

Every company that I ever worked for or worked alongside had policy regarding what to do when someone was injured. And so if Costco had that policy, which I did not see in the documents that I was provided, the employees clearly were not trained on that.

And I'm sorry if I went long on the answer or a little sideways, but that was my kind of -- my observations.

**Q And so, Mr. Kanevsky, you are not a medical expert; correct?**

A Absolutely not.

**Q Okay. And you're not going to give an opinion as to whether any postfall conduct by Costco's employees aggravated Mrs. Loo's injuries; correct?**

A I do not know where the injury occurred or when it occurred. But the behavior of the employees postfall could -- could have resulted in injury. But I can't speak to the injury portion. But any -- any common-sense individual can see the danger of trying to lift somebody off the ground before EMS arrives.

**Q If somebody falls in a retail location, is it sometimes okay for an employee to help the person**

**back up to their feet?**
A You ask the employee -- you ask the employee how they're feeling and gauge what it is, and you have to ask if they want that help. But in no circumstance is it okay to lift them up. This wasn't Marvena Noel extending her hand and Mildred Loo taking her hand and getting off the ground as you or I would if we fell. This was her putting both hands underneath Mildred Loo and trying to lift her up off the ground.
**Q And when you said ask the employee, did you mean ask the customer?**
A Yes. I'm sorry.
**Q Okay. And --**
A My bad.
**Q -- so if the customer gives consent to be helped up from the ground, would that be appropriate, in your opinion?**
A Again, I would say it's never okay to lift someone off the ground. And I'm motioning my hands like your hands under a body and lift someone up to hoist someone up. I would never think that that's okay. That is a huge leap from extending your hand and having someone get up off the ground holding your hand. That is -- it is a complete different thing.

The levels are far-and-away different.

**Q So in a hypothetical, if an employee asked a customer, "Can I help you up," and starts to lift them up, it's your opinion that that's inappropriate?**

A Correct.

**Q Okay. And the same about -- later Mrs. Loo is moved into a wheelchair. If an employee asks a customer, "Would you like to be moved into a wheelchair?" and the customer consents, is that appropriate?**

A If the customer can get up off the ground on their own and sit in the wheelchair and they are more comfortable to do that, I would say it's fine. It would not be something I advise my employees to do to lift them up to place them in the wheelchair.

**Q In what areas do you believe Costco was deficient in training its employees?**

A Yeah, I think I answered that question already. I think it would be in all areas related to personal interactions with customers and staff related to this case. You know, just -- Marvena Noel didn't look where she was going when she backed into Mildred Loo. She just turned abruptly and knocked her to the ground.

There was -- there's no -- you know,

there's -- there's no policy or training on being aware of your surroundings. There's no training or coaching on what to do in case a member or a customer is injured. There's no training on the foot traffic management in the front end based, again, on the documents that I observed.

**Q Okay. How would the training that you just described have made a difference in this particular situation?**

A Well, I mean, if the employees are trained to -- you know, to check their surroundings before making abrupt motions, then Ms. Loo isn't knocked over. She's not backed into. If the employees are trained on how to handle an injured member or an injured customer, Ms. Loo isn't lifted off the ground. You know, trained professionals should do that.

**Q And what is the basis for your opinion?**

A I'm sorry. The --

**Q The opinion that you just gave in terms of how training would have made a difference in this particular situation, on what are you basing that on?**

A I'm basing that on my experience. I'm basing that on policies and procedures and training that I've observed at other retailers, and I'm basing

it on common sense.

**Q And so you would agree that because this is common sense, a juror would be able to reach that conclusion on their own?**

A I don't know what you're asking here.

**Q Well, what I'm asking is --**

A Go ahead.

**Q You described this being something that's common sense, and I'm just trying to figure out, does the jury need an expert to tell them what's common sense?**

A It's not my job to decide what the jury needs. It's my job to give the opinions based on my retail experience and expertise as to where Costco was deficient in this case. If it's common sense to me, then I would imagine it being common sense to a jury, but it's not my job to decide what a jury does or does not need. I was retained in this case to give my expertise, and that's what I'm here to do.

**Q Have you ever trained your employees not to touch customers who have been injured at a store?**

A Absolutely.

**Q Okay. And what does that training entail?**

A It's a review of hypothetical scenarios. If this happens, you do this. If that happens, you do

this. We always taught our staff that if a customer or an employee is injured and requests medical assistance, then you defer to the medical professionals when they arrive.

**Q Okay. And would you agree that Mrs. Loo had room to take a wider berth around Mrs. Noel as she walked on from the checkout area?**

MR. CLAUSE: Beyond the scope.

Go ahead.

THE WITNESS: No. I would -- I -- I don't think that that's fair. I think that Mrs. Loo walked around the counter as any normal person would. And it's not her job to make sure that somebody doesn't back into her, unaware of their surroundings.

You know, any -- any normal person is going to come around the edge of the counter to retrieve their cart. And in my observation, I thought Mildred Loo behaved as many of the other customers in the register area did, except she was knocked over and they weren't.

BY MR. DUNN:

**Q We've talked already about the warehouse -- the retailer's responsibility and the employees' responsibility for customer safety. Do customers such as Mrs. Loo -- do they have any personal**

A Based on their depositions, it's my opinion that they knew that they were supposed to be aware. Mr. Torres spoke to it more so than Ms. Noel did, but it is my opinion that they had some awareness to be aware of their surroundings. But there was no documentation or training on exactly how to do that.

**Q Does the fact that they were aware of the importance of spacial awareness suggest to you that they had been trained?**

A No. I think it's -- not necessarily. I think it's just -- they know they work at a busy store; right? And Mr. Torres said in his deposition -- he spoke to it, saying that there was no training behind it but he knew to be aware of it. I think he said -- I don't remember the exact quote, but he said it multiple times. I don't remember if it was head on a swivel or something of that nature. He referred to something multiple times in his deposition that showed that he had awareness for his surroundings. But he also said in his deposition that he was never trained on it. So based on his testimony, it's -- it was my conclusion that he figured it out but wasn't taught, if that makes sense.

**Q Is a certain amount of spacial awareness**

**common -- should be common sense to everybody? You**
**know not to bump into people.**
A To an extent. To an extent, we all have an obligation to be aware. But when you're working in that retail setting, that has to be heightened because of the risks around you.
Also, you're there every day. So it's more important for you as the employee to know how to move in a crowded area because you do it all the time, where a customer may only go out here and there.
**Q Under the heading that reads "Lack of recognition for diverse customer needs," what do you mean by that heading?**
A Every person is different and everybody is going to have a different reaction to their environment, and it's up to the retailer to provide a safe shopping space for all people, for young and old, for healthy and unhealthy, for all different walks of life, different segments of society, if you will; right?
Everyone should be welcome in the retailer. Every member should be welcome in Costco. Every customer should be welcome in every store; right? And -- but some customers are going to be, you know, of higher risk like a toddler or a child or an

**Q Do you have any information as to the amount of force it would take to knock a person of your size over?**

MR. CLAUSE: Beyond the scope.

Go ahead.

THE WITNESS: I think that anybody who's not ready or prepared to be knocked into impactfully could potentially fall.

BY MR. DUNN:

**Q And is that -- is that an opinion you're giving as an expert or is that common sense?**

A My expertise is based on the behavior of the employee and the lack of awareness for who's around. The result of the -- the result of who would or would not have fallen is not my area of expertise, but the person in this case did fall, and she fell as a result of the collision.

**Q There's a section here. It says Number 2, "Improper positioning and role of Marvena Noel."**

A Yeah.

**Q I'm sorry. Improper positioning and role of Marvena Noel.**

**On what do you base your opinion that Ms. Noel was not supposed to do a cash pickup?**

A That was based on the depositions. She

stated that she was -- she stated that the cash pickups were supposed to be done by a manager or a front-end lead, I believe.

**Q Okay.**

A And she was a membership clerk. Her role at the time of the accident was a membership clerk. So I'm basing it on her testimony.

**Q Okay. Are you critical of Ms. Noel for doing a cash pickup?**

A Yes.

**Q Okay. And why?**

A It's my understanding -- and, again, just based on the information that I was provided, it's my understanding that Ms. Noel was to be a membership clerk in the membership area and that there were managers on duty scheduled specifically to handle the front end.

**Q Ms. Noel has worked for Costco for over 20 years. Do you not consider that enough time for her to learn how to do a cash pickup?**

A It's not about what she knows how to do or doesn't know how to do. It's about the schedule and the plan and where she's supposed to be based on her role at the time.

And if there's a quarterback, as we stated

earlier, using that analogy, to control the front end, then that person would have either put somebody in position to do the cash pickup or done it themselves, based on her -- this is based on her testimony saying that she had stepped down from that membership position to be a -- I'm sorry -- from that managerial position to be a membership clerk. That opinion is based on her testimony.

**Q And are you aware of any Costco policies that prevent someone in Ms. Noel's position from assisting with a cash pickup?**

A No.

**Q And it also mentions -- well, okay.**

A I also wasn't provided the documentation for who can and cannot do a cash pickup. I was provided with Ms. Noel's deposition, which I used to formulate my opinion.

**Q Okay. So you say here "Tasks like cash pickups should be handled by employees specifically trained and assigned to those roles, especially in a crowded area where proximity to members is a concern."**

**So can you -- can you -- are you assured that Ms. Noel has not been specifically trained to do a cash pickup?**

A She said in her deposition that she was trained to do it, but she wasn't assigned to be there in that role at that time.

**Q You also mention -- let me -- I'm going to try to get to the properly -- you also mention that -- you say "The video footage further highlights that Ms. Noel appeared to be moving frantically before the incident." How was Ms. Noel moving frantically?**

A So there was -- there was a scene -- I'm not sure what exact time in the video, but she's back and forth on that pad, on that front-end pad. At one point, she's got a large item in her hands and she's -- so in watching the full video, she's back and forth on that pad and just -- again, I respect her hustle. She's moving fast. She appears to be a hustling individual, which is great. But at the same time, it always seemed -- and again, I'm looking through one lens on one frame on one camera of a video; right? So it's a very narrow perspective. But in that perspective, she's -- again, my observation is kind of moving, quickly darting in between customers back and forth through that front end instead of being stationed at the membership area where, based on her testimony, she said she was

supposed to be.

Q Okay.

A And then during the accident, she, you know, races over to the cash rack to make the pickup and abruptly backs up into Ms. Loo.

**Q Okay. I'm going to show you what I will eventually mark -- well, I'm going to mark it as Exhibit 4. I'll have to put a link in the chat because the file is too big.**

**So, Mr. Kanevsky, I've put on my screen what I'll mark as Exhibit 4. And I'll represent to you that this is a portion of the surveillance footage in this case. And the time stamp on this video is 59 minutes and -- well, it's 59 minutes and 33 seconds into the video is where I have it paused, and the time stamp at the top is 1:31 p.m. and 59 seconds.**

**So I'm going to press play here. And I'll represent to you that Ms. Noel is going to enter from the bottom portion of this screen.**

**And I will pause the video right there.**

**Mr. Kanevsky, did you see anything in that video that you would characterize as frantic on the part of Ms. Noel's actions?**

A In that frame, I wouldn't say frantic. But

she was, again, you know, moving quickly. It looks like she stops short and makes an immediate left turn to the register. She wasn't headed directly to that register. She walked past it slightly and then stopped and moved towards it.

(Exhibit 4 was marked for identification.)

BY MR. DUNN:

**Q And why are you characterizing that as frantic?**

A Well, again, that -- my observation wasn't based on just this particular portion of the video. It was based on all of the other portions of the video that I observed where she was in it. If you rewind even further before the accident, she comes from the top of the screen and heads out of the picture on the bottom of the screen, weaving in between customers, holding a large item.

**Q Okay. And I don't know if I can -- I'll be able to locate that because it's a very long video and, you know, I might not be able to get to the certain -- the specific portion that you're referring to. But it's your description of the video that -- oh, I think she's up here.**

A Yep.

**Q And I don't know if you can see my cursor.**

A Yep. I see it.

**Q Okay. So I'll just press play.**

**So Ms. Noel is up at the top. And so I paused the video at 59 minutes and 13 seconds in, and we just saw Ms. Noel walk from one of the far registers down towards the bottom of the screen.**

**Mr. Kanevsky, did you see any actions on the part of Ms. Noel during that clip that I just showed that you would describe as frantic?**

A I would -- maybe that isn't the proper description for that particular frame. But I do believe that her movement and her placement based on the role and her testimony put her in a position to create an accident.

**Q And you also indicate in your report -- I think we -- so the third heading is "Inadequate response to injured individuals." I think we've talked about that previously. So I will move past that.**

**There's a section on the bottom of page 3 that I can put up on my screen again. It says "Failure to secure the area post-incident." And can you describe this criticism.**

A Yeah. Can you go back to the video. You don't have to play the video, but can you just put it

up on the screen.

**Q I can. Just one moment.**

**So I'm now --**

A You can pause it at any point. Okay. Perfect.

**Q So I've paused it. On the bottom, 1 hour and 56 seconds, and at the top, it's 1:33 p.m. and 22 seconds. So go ahead.**

A Right. So -- and this is perfect because Ms. Loo is on the ground here.

The registers immediately to the left side of the screen -- I don't know what numbers they are, but I'm going to call them, like, 1, 2, and 3, those three registers right there; right? Those three registers continued to operate business. But if you look at the registers at the top of the screen where there's no cashier closest to the exit, those registers are empty.

Ms. Loo is on the floor. She's injured. She -- we should be waiting for EMS at that point. The customers continue to check out at those registers and walk past Ms. Loo. I would have liked to see the business routed to the registers closer to the top of the screen and clear the area at the bottom of the screen by Ms. Loo. I get that that is

cumbersome to do, but -- I get that that's cumbersome to do, but I do believe that that would have created a cleaner response to the injury --

**Q Okay.**

A -- for lack of a better word.

**Q So in terms of failure to secure the area post-incident, your criticism relates to the fact that Costco didn't move the customers that were checking out to a different register where they weren't right next to Mrs. Loo?**

A Exactly, popping open those unused registers to the top of the screen, routing the traffic that way, which clears the area to an extent. It's not going to -- you're never going to clear -- in a busy store like this, you're never going to clear the full area, but you can create less of a traffic pattern.

Being an empathetic person, right, you have a woman who's on the floor who's potentially injured who fell; right? In addition to any pain she might be in, she's probably embarrassed; right? And now you have these people walking around her all over, looking down at her. And that could create, you know -- if I was her, I would feel -- I would feel uncomfortable; right? I'm not an expert on feelings, but I'm an empathetic person. And if I was running

the front end there, I would have at least made an attempt to route that traffic away from her, give her a little bit more space while we wait for EMS.

**Q Okay. And you would agree that Mrs. Loo did not get hit by another member's cart after her accident?**

A She did not. This is not about -- this observation and criticism is not about a further injury to Ms. Loo being hit by another customer. It's about being empathetic to someone who just fell and trying to give them a little bit of space while everything is going on.

**Q Okay. And so -- and I appreciate the distinction you're making. And so -- you know, I take lessons with me from every case. And so essentially, I think you've described it where, when a person has an accident at the end of the register, the best practice is to divert the customers to the other registers, essentially.**

A I'd want to do everything I can to make the customer as comfortable as they can in a difficult situation. And in this case, it may not have been easy to do. It may have been very cumbersome in a busy store like this. But there are open registers that are further away from the incident and also

closer to the exit, which would have diverted that traffic away from Ms. Loo and given her a little bit more space.

**Q In terms of making a member more comfortable or less embarrassed, is it -- would it be more comfortable or less embarrassing for Mrs. Loo to have been moved into a wheelchair rather than to remain on the floor?**

A If Mrs. Loo was able to get up off the floor herself and get into a wheelchair, of course that's the best course of action. But hoisting her up off the floor and trying to physically lift her when we don't know what her injuries are, that would be not approved. I would have preferred to stay with her, comfort her, wait for EMS to get there so that the medical professionals can make sure that she's handled properly.

**Q Okay. And then going back to your report -- and I am almost done -- you mention repeated incidents involving members knocked over by staff, and it says a pattern of similar incidents. What, in your opinion, constitutes a pattern?**

A I would say if you have three -- we talked about this already. If you have three customers knocked over by staff in a relatively short period of

time, I would consider that a pattern, documented incidents.

**Q And that's per location or nationwide? How many -- you know, how many incidents need to happen for there to be a pattern?**

A I'm only privy to the information that I was provided, which was the three -- I believe three incidents at this warehouse. I have no idea nationwide how many people are knocked over daily at Costco.

**Q And do you have enough information to opine on whether those prior incidents were similar or dissimilar to this accident?**

A Well, a customer being knocked over by an employee, I would classify as similar.

**Q Okay. And -- okay. I think we've covered for the most part what I had.**

**Mr. Kanevsky, thank you for your time today. Do you feel like you were provided all the relevant information you should have received to produce your most accurate report as possible?**

A I do.

**Q Okay. And have we discussed all the opinions that you intend to offer at trial in this matter?**

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and date herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 12/15/2024

Vesna Walter
RPR, CCRR, CSR No. 11989